Good afternoon, Your Honors. May it please the Court, I am Brent Blakely for Appellant Laurie Heinemann. Hardly a day has gone by in the past several years where you haven't turned on the TV or read the newspaper and seen a story about corporate corruption. Even this morning, in front of the business section, there's an article about Enron about... Counsel, as I understand it, this woman got fired because she forged a customer's signature on a phony order so that she could get a commission. Meanwhile, unbeknownst to the lady that fired her, Grace Caden, she was talking to the SEC. Now my problem with it is, suppose, let's get to a hypothetical instead of this case. Suppose a person embezzles from an employer, the employer catches the embezzlement and fires her for embezzlement. Unbeknownst to the employer, the person is talking with law enforcement authorities about criminal conduct that the employer is engaged in. I do not understand why talking with the authorities about criminal conduct that the employer is engaged in would give the employee immunity from getting fired for embezzlement in my hypothetical case. I would like you to say whether it would or whether you would agree with me that it wouldn't, and if you agree with me that it would not give the employee immunity, explain why this case is different from that hypothetical. Your Honor, this case is different for several reasons. So you would agree that that's so? This case is different from that case for several reasons, Your Honor. Oh, you would agree that the embezzler who's secretly talking to law enforcement about the employer's crimes would not be immune and could be fired? If in that situation, none of the people that were involved in the investigation for the embezzlement or who made the decision to terminate knew about the protected activity and influenced or potentially influenced that embezzlement investigation, if in that case, the defendant had demonstrated beyond a question of fact, and in this case, their burden is on clear and convincing evidence pursuant to Labor Code Section 100. Okay, now let's change it and say they did know. They say, this person is stealing from us. She's stealing right out of the cash register. But she's talking to the cops now. Won't we get in trouble if we fire her? Do they have to let her keep working and stealing, or can they fire her despite their knowledge, so long as the reason they're firing her is the embezzlement? Your Honor, in the situation you're giving, again, it's entirely different than this situation. First thing, with regard to the StarCrafts contract, they have never demonstrated that Lori Heinemann forged that signature. There is no proof that she did it. They never spoke with Mr. Olson, whose signature was on the contract. They didn't even work at that customer's place anymore. But they never established that Lori Heinemann did that. They never talked to Ms. Heinemann about it. They never talked to Olson about it. They don't even have to be right, not that you've demonstrated anything to suggest that they're wrong. All they have to do is be firing her for that reason, even if they're wrong. Your Honor, in our case, and if you were going to say it in the embezzlement case, too, if the people that were running that embezzlement investigation, some of them were actually named in the complaint, the DFVH complaint, the head of human resources, Brian Urquhart, or the VP in charge of this, was running the investigation. The general counsel who spoke to Heinemann about her protected activity was obviously behind the scenes and working on it. And it was the supervisor that was named as a defendant actually is the one who actually made the decision to terminate. Is there any evidence that she wasn't stealing, they knew she wasn't stealing, and the real reason they fired her was because she was talking? You mean in this case? In this case. Well, you mean the evidence that she didn't... Of course you must have her signature on an order in order to get a commission. You're not entitled to a stealing. That whole trumped up allegation, Your Honor... Is there any evidence that it's stuck? Yes, it is, Your Honor. This occurred... And Your Honor, to make me adhere to the position you're asking me to, ignores Ninth Circuit precedent for the last 20 years... Let's talk about the record before we get to the precedent. Where is the evidence that it's trumped up? The evidence that it's trumped up is that it occurred in close proximity to her complaining to law enforcement or her reporting to law enforcement and them finding out about it. Is there any evidence that she didn't do it? The Ninth Circuit... There's no evidence that she did. The evidence that she didn't do it, she denies doing it. I guess the evidence that she did do it is the cut and pasted in Xerox signature and the fact that when they checked with the customer, they hadn't placed that order and the man whose signature was on the order didn't work there anymore. Your Honor, the customer said that they can neither confirm nor deny that that was cut and pasted by Lori Heineman. That's what Starcrest did in response to Computer Associates request that they respond to that. They never spoke to Olson. Basically, what you're asking me to do, Your Honor, is say, all right, we're just going to take Computer Associates' word over Heineman's word. There's a question of fact there, Your Honor. But what makes it even... Olson saying, yeah, I still work there and I signed that and that's a legitimate order that I placed on behalf of my employer. I mean, you had as much power to subpoena Olson as they did. That's correct, Your Honor. And I'm trying to remember why we didn't get him, but... Well, I suppose you can't subpoena him to make a statement to the employer three months earlier or six months earlier or ten months earlier. The question is, what did the employer know at the time that they ordered the termination? It's not whether later somebody could have said something to them that... Here's... Judge Kleinfeld, this is what... This is my... That's Canby here. I'm sorry. The... All right. Excuse me, Your Honor. Go ahead and answer Judge Canby's question and then I want to take you back to your answer that you gave me. It just makes no sense, Your Honor, why Lori Hyneman, who had a bullseye on her chest 30 days after reporting to the government, would falsify a contract that she would look to make $138 on when her annual income was $170,000. When she was reporting... What does make sense, Your Honor, is that... And this is, again, this is going back looking at the totality of the circumstances which this court has repeatedly for the last 20 years said you have to do because it involves motive and intent and all these other factors as to... You cannot look at these decisions with blinders on. You have to look at everything. And what was going on at this time is the SEC was conducting an investigation in Computer Associates accounting fraud to raise the stock prices. They had gotten in touch with people at Computer Associates. We know that from Stephen Richards. They got in touch with him. That's Andy Richards' brother. They, at this time, didn't know what the government had on them. And then they find out that Lori Hyneman is the one that's providing the government with the information. What Computer Associates wanted to do was to find out what she was telling the government. That's why you have the cat's email to her right after she gave the report. We need to find out what you've told the government. And then she says, well, I'm afraid of being retaliated. I need to get an attorney first before that happens. And that's why you can see from the facts that what they were going for was her laptop, a laptop that had already been subpoenaed by the government, and she was waiting to turn over. They had to send an FBI agent to her house for chain of custody reasons. They followed her to her house to get the laptop. That's what this was all about. Counsel, when I asked you my previous question, you said that StarCrest, that none of this could be proved about her falsifying and that StarCrest said that it couldn't validate that the signature was cut and pasted. So I pulled out the Grace Caden declaration and the letter from StarCrest to see the context of that. It's a letter from StarCrest to Grace Caden, and it says the facts of the CA agreements you sent to me shows a signature by Jerry Olson, director of data processing at StarCrest. While he is still employed at StarCrest, Jerry is no longer director of data processing and hasn't been for several years. Your supposition that someone at Computer Associates cut and pasted Jerry's signature from a prior agreement cannot be validated or disproved by StarCrest. However, StarCrest has just recently received an agreement for its review. That review has not been done, and StarCrest has not signed the agreement. And then it says in handwriting, evidently by the person who signed it, the vice president of StarCrest, this letter was provided to internal audit upon our request and notes that StarCrest has not yet signed the contract in question. That handwriting could also be by Grace Caden. It's attached to her declaration. So it looks as though there is proof that it was a forged order. And Grace Caden's declaration says basically that's what I found out, that's why I fired her, and I wasn't even aware of anything suggesting in any way, shape, or form, as the way she puts it, that she was complaining about anybody's accounting practices. Your Honor, I'm very familiar with that document. It sounds a little different when I read it in context from the way you represent it. No, it doesn't at all, Your Honor. There is no proof that Lori Heineman cut and pasted that signature on there. What happened was this document was faxed to her, and then she passed it on. That's what happened, and that's what she testified to. There is a disputed material fact on that issue, Your Honor. There is no proof that she cut and pasted that document. That's really the heart of the problem. It's something that has to be proved at trial that she was the forger. And that's why, and again, I understand you're testing me on this, but that's why the Ninth Circuit repeatedly has said you have to look at the totality of the circumstances here. It is very clear when you take the blinders off and look at everything that's going on here, when you get away from there for non-discriminatory reason, that there was a lot of other motivation for getting rid of Lori Heineman and finding out what was on that laptop. Where is it in the deposition? What does she say? In the deposition? I don't have the deposition in front of me, Your Honor. What you said was that in her deposition, she said that was the way it was faxed to her. She had nothing to do with putting that signature. That is in her deposition. I believe it is in the record. I just don't have the site in front of me, Your Honor. But that is a material disputed fact, but also the proximity alone, Your Honor. One month from Computer Associates finding out that she's cooperating with the FBI, she's gone. And there's this big rush to get the laptop. I suspected that if she had the laptop at the meeting, they would have ripped it from her hands right there. Wait a minute. I don't get this part. It's their laptop. She no longer works there. Why doesn't she have to give the laptop back? If the government wants the laptop, the government can get the laptop. It can do a search warrant and take the laptop. She was under subpoena. They were sending an FBI agent to get the laptop. Under subpoena. Your Honor, I'm sorry. You're leaving out some words. Did the subpoena command her to keep the laptop and produce it in response to the subpoena? My understanding was, and I think the answer to that is yes. My understanding was she was subpoenaed. She sat down. A lot of grand jury subpoenas, they just tell you to show up at a particular place and testify. And they don't say anything about a laptop. And what I'm thinking is it's not her laptop. It's their laptop. Now, if they destroy evidence, then they get another federal charge. And if she thinks the government ought to have the laptop, she can call whoever she's talking to at the government and say, hey, they want my laptop back, and the government can take it with a search warrant. Or they can take it without a search warrant, and they can fight with computer associates. But it's not her laptop. Your Honor, the top executives of this company, including the CEO, have been charged with obstruction of justice and destroying evidence. But I mean all the employees can steal the laptops. And several have pled guilty to that. I think the taxpayers – They could blackmail the company and leave it bereft of funds to pay the government fines. Your Honor, I think that the taxpayers and certainly the shareholders of computer associates are very happy that Ms. Hyndman turned over the laptop pursuant to a subpoena to the FBI and not to computer associates. And that's the, you know, there is a – Are you saying that as soon as she left with the laptop, she gave it to the FBI? I thought she kept the laptop for quite a long period of time. She kept the laptop until the FBI agent came and picked it up, Your Honor. And that was well after she had been fired and taken a laptop with her surreptitiously and refused to return it in response to her former employer's request? Your Honor, the laptop was at her house. She didn't take it surreptitiously anywhere. It was the laptop that she used at work that had all this information in it. It was kept at home with her? It was at her house, Your Honor. She's – and it gets back to the – there is, you know – Sarbanes-Oxley was obviously enacted in response to Enron in cases like this one right here, Your Honor. There is a very strong public policy in this country that has been the public policy of the State of California for 20 years prior to that when they did their own whistleblower act to protect – to encourage whistleblowers – well, here, I'll tell you what the stated policy of the California legislature when they did the act was that employees of a corporation are in a unique position to report corporate wrongdoing to an appropriate government or law enforcement agency, that it is the public policy of the State of California to encourage employees to notify appropriate law enforcement agency when they believe their employer is violating laws, and that it is the intent of the legislature to protect employees who report wrongdoing to the government. That was in 1983. And the California Act was even amended in 2003 to make it even – basically that once a plaintiff establishes his or her prima facie case that – of retaliation, under the McDonnell-Douglas burden shifting, the employer has to establish by clear and convincing evidence that the alleged action would have occurred for a legitimate, independent reason even if the employee had not engaged in the protected activity. In other words, it has to be so clear that there's no room for substantial doubt. Your Honor, there are questions of fact in this case that would certainly defeat that burden with their defensive ignorance in that they have a non-discriminatory reason. If her only purpose was to turn over information to the government, why would she delay giving the laptop to the government until November of 2003? I don't see that. It seems like she would have given the laptop to the government at the very latest in April 2003 when she had a meeting with them. She was subpoenaed by them, and she was basically under the agreement of that meeting. She hung on to the laptop until the FBI agent came by and picked it up. The concern that I have is you are absolutely right that it's federal policy to encourage whistleblowers. However, there is a real risk when a corporation is committing crimes that the employees, figuring that the corporation is not in a very good position to go to the authorities, will commit crimes against the corporation. Both will be committing crimes, and the shareholders, instead of suffering from one set of crimes, will suffer from both, as will the people of the United States and the public order. And it's hard for me to see why this isn't that case. Your Honor, she, and that's very clear in the record and cited in the briefs, she was talking to them and turning over this information pursuant to a subpoena from the SEC. She was talking to the FBI. I mean, she was having discussions with law enforcement about Computer Associates' accounting practices. The minute the company found out about that, they made an attempt to find out what she was telling law enforcement, and then when she said, no, I need to get an attorney because I'm afraid of being retaliated against, she was fired. Basically, in one day, they'd likely believe that in one day this low-level person in accounting saw a contract, didn't interview anybody, and then made the decision that she should be terminated and that no one else had any involvement. But in their briefs, they ignore Brian Urquhart, the individual who the complaints were mailed to and who was obviously involved in, if not running that investigation. Joel Katz, who was also aware of the complaints, who was also in the loop on that investigation. And most importantly... When you say on that investigation, you mean the investigation of the alleged forgery? Yes, Your Honor. Yeah. And then finally, Andy Richards. He's the one that made the decision to terminate her. Even in Kayden's declaration, she says, I just made a recommendation. It was Richards who pulled the trigger. An individual who was a named defendant in her complaint. And Kayden skirts the issue in her declaration and said, well, I didn't talk to Richards about the investigation. She didn't say she didn't talk to Urquhart or Katz because it was clear she was in the legal and the head of human resources was in the loop on this. I think that stepping back, looking at the totality of the circumstances, there are numerous tribal issues of fact regarding whether or not there's a connection between the adverse employment or between the protected activity and the adverse employment action. And if what they are trying to do, if this ruling is allowed to stand, Your Honor, it will create a very dangerous precedent which would gut the entire policy behind these whistleblower statutes. Because any employer, particularly an employer with billions of dollars and all these resources, they're going to figure out some way to get you and trump up some way to get you terminated and get you out of there. And, Your Honors, I think a jury could easily infer that that's exactly what happened in this case. And what little time I have, I'll reserve for rebuttal. Unless you have a question. Excuse me, Your Honor? Oh, I apologize, Your Honor. All right. Thank you, Your Honor. Thank you, counsel. Good afternoon. May it please the Court. Seth Rapkin for Computer Associates International, Inc. If I can start by answering a couple of the questions that I don't think were answered by Mr. Blakely. First of all, the issue isn't did she actually forge it. I would submit that the evidence suggests it would be virtually impossible to conclude otherwise. But the issue is, as I think Judge Campbell pointed out, the issue is what did the company know at the time it made its decision. And when you, Judge Kleinfeld, as you pointed out, the letter from StarCrest is pretty overwhelming evidence. Well, how does that prove that she signed it? Well, my point is. No, I ask you, answer my question, please. Sure. How does the letter from StarCrest prove who pasted the signature on? I would not rely on it for that issue of who actually forged it. I would rely on her deposition. Answer my question. I'm going to. It's her deposition testimony, which is that in the record, the excerpt of the record, not the supplemental, at pages 336 through 338 and then 341 through 342, that's Heinemann's deposition, where she answered the question, who faxed this agreement into the sales accounting office? And she said, I did. She didn't say, gee, I got this agreement. Excuse me. The question was who attached that signature to what was faxed. She doesn't say she cut and pasted it on there, Your Honor. That's the key question. And you haven't answered that. Yeah. Is there evidence on that point? Yeah. Well, what I'm getting to, Your Honor, I think is a matter of law. What? As a matter of law, the employer does not have to be actually right about who forged it. The employer's – the issue is whether – You want to dodge the factual question and give me the answer of law. Factually, you don't have the evidence, do you? There is not the direct evidence that she – There is no evidence. That she cut and put it actually on there. We're dealing with circumstantial evidence both ways. Correct. Whether a computer associate set her up or whether she did this crime. I don't know the answer. You think you do. And the judge also thinks he knows. But we don't know. And we haven't had the evidence on it. That's why we have trials. I can – Excuse me. Let me finish my little exploration of this. So we have a factual question. Did she commit a crime? Now, isn't it normal procedure in most companies if an employee of some years is accused of dishonesty to ask them what they did? I think that is common practice. Was that done here? Yes. She was – there was an inquiry from the Sales Accounting Office from Brian Darcy to Ms. Heineman, and she left him a voicemail in response. And she confirmed this in her deposition, and the voicemail, the transcription of it, I believe, is an exhibit, and it's authenticated by Darcy's declaration, where she explained why Olson signed it. She didn't say, gee, I have no idea. She said, this is why Olson signed it, because Tim, who was the person she knew had to sign it ultimately, wasn't around or something like that. But she offered an explanation as to why she did it. Yeah, well, that's relevant. That's relevant. Yeah. And the point – and I didn't mean to interrupt you, Your Honor. No, that's fine. The point I was making about the issue of law is simply that I think the Court correctly has, in past cases, taken a position, as other circuits in the state courts have, that you can't – the measure can't be can the employer actually prove the misconduct. It has to be is it reasonable for them to rely on it, because the inquiry here is into a retaliatory animus. And if, based on all this circumstantial evidence, from Starcrest conferring with them Ms. Heineman's explanation, I submit in this case it certainly is a legitimate reason articulated by the defense at the second stage of the shifting burdens. No. Passing over the question whether there's enough there to reach a reasonable belief, we have to go on to the second question. Did the person who made the decision have any other motive in mind? It looks as though at least one of the people did know that she was a whistleblower. And I think that's – in my view, that goes to the crux of the issue presented here, which is it really is testing the bounds of what's a reasonable inference to draw versus what's speculative inference. And the position they're taking is this. The Court should indulge the inference as a rational inference from – let me start over. What they say is, look, we've established this, that she complained. That's conceded. They say we've also established that some people in the organization knew that she complained. I concede that. They also say that some people in the organization who knew about the complaint knew that this investigation was going on. I concede that. What they want you to do is to indulge the inference to say it is reasonable, therefore, to infer from those facts two things. One, that those people with knowledge were therefore – that they must have been involved in this investigation. I submit there's zero evidence of that. And two, not only that they were involved, but actually doing something to affect or influence the outcome in a particular way. And if I may, I'd like to go to addressing the evidence they say should support that inference, because in my view, it would be an unreasonable one. And again, their burden, as this Court has stated before, is to come forward with specific substantial evidence of pretext. Now, what they point to is four people. Andy Richards, who was her indirect manager. He was the head of the sales section that she was working in in California. Joel Katz, who was not the general counsel. He was one of several deputy general counsels in New York. Dorothy Pace, a West Coast HR manager. And Brian Urquhart, an East Coast HR manager. But when you actually look at the evidence that they cite, for example, at page five of their reply brief, they point you to – for the evidence to say that Urquhart was – and he just said it again. Urquhart was probably running this investigation. What's the evidence that supports that? No testimony from Urquhart. Zero testimony from Grace Caden, who is on the record saying, I ran the investigation. What they cite to is Andy Richards' deposition testimony that says he had two telephone conversations, one at the outset of the investigation and one at the end. In the first one, he said his testimony was – and this is at excerpt of the record 1706. His testimony was, I got a phone call from Don Hoffman in sales accounting, and somebody – either Don or Brian Urquhart, but I'm not 100% sure. He literally said, I'm not 100% sure. And the upshot of that conversation was to let him know that this contract was being investigated. His – Richards' testimony was, that was it. They let me know, they didn't ask me to do anything, and I was going to wait to hear from them. That's the evidence that they're trying to show that Urquhart was running the investigation, from somebody's testimony saying, I'm not even sure if he was on the phone. The second piece for Urquhart is then a conversation that Richards had at the end of the investigation where Hoffman called him and said, internal audit investigated. They've concluded it's a forgery, and the recommendation is it's a terminable offense. And, again, Richards said that he believes Urquhart was on that conversation. So I want you to infer from simply the fact that HR was made aware of an investigation, which is, I submit, common policy, and made aware, you know, that the termination decision was being recommended, it's natural to involve HR in that, that therefore Urquhart must have been involved in that investigation, and therefore, and also doing something to influence its outcome. And I submit that's not a reasonable inference from Andy Richards' testimony about a conversation in which he's not sure Urquhart was on the phone, at least as to the first conversation. The recommendation to fire does not have to result in firing. No, that's true. Grace Gaten was clear in her declaration that what she said is I've done my investigation. My conclusion is that this is a cut-and-paste job, and I recommend termination. And it is true that where I disagree with Mr. Blakely is, I don't think you can say Richards is the one who pulled the trigger on that. I mean, the way, you know, it's a big organization, and the way it came to Richards was, this is what internal audit is saying, you know, it's a terminable offense. That's what he got from sales accounting. It's a terminable offense, and he said, all right, what do I do to affect it? And that's when Dorothy Pace became involved as the local HR person. Would you have been free to say, well, I really think you ought to reconsider this? I don't know that that, I mean, that wasn't developed in the record. I mean, I could speculate as to whether, it would be really speculation as to whether. It's hard to know who participates in the decision to fire. Sometimes, you know, it's, sometimes there's a lot of conversation back and forth about whether to fire somebody, even when you've concluded that it is an offense for which you could fire them. Agreed. And I think that's, but that's the evidence that's lacking here. When you look at the other cases that they're relying on, and one case that I think is important from this Court is the Bergeen case, where you're dealing with this issue of, all right, the ultimate decision maker, who I'm saying in this case is Kayden, and I realize she's making, you know, a strong recommendation as opposed to the decision. But the cases that address, all right, well, she's insulated from knowledge about the protected activity. But if someone else is in the mix influencing her decision, that influencing, that animus could be imputed, but that's the evidence lacking here. Let me get at it from a little different direction. Kayden recommends termination, implying she does not have the power to fire. I'm thinking somebody has to have the power to fire Heinemann. Right. Now, that person may try to avoid taking responsibility in case things turn sour. That person may rely on recommendations. That person may consult. That person may do all kinds of things. But somebody in the hierarchy has authority to fire. That must have been developed in the record, who actually had the authority to fire. Here's what I want to know. Who had the authority to fire her, and what is the evidence that it was because of Grace Kayden's report, and what is the evidence that it was because the person with authority to fire her knew or somebody else who recommended termination to that person knew that Heinemann was talking to the SEC? All right. As to the first part, who has the authority to fire her, the reason I said that it wasn't developed is I believe that is the case. What was developed is the recommendation came from Kayden, and Richards, who was the manager in the sales organization, that is the most developed part of the record is that he at least had authority in that organization. If he pushed back and said, I don't think we should do this, I don't know, from the record, whether there were other layers. So I suppose what I'm saying. Somebody must either call her or send her a letter. Exactly. And what I'm saying is he gets the recommendation and says, okay, how do I execute this? They say, talk to HR. That's Dorothy Pace. He coordinates with her, and Richards then directs Fulgham and Palmer. So Richards fired her. That's correct. Who actually conveyed it, I believe, was Fulgham and Palmer, but per Richards' direction. Richards fired her after getting staff advice from HR on how to do it and staff advice from Kayden on why it should be done. Correct. Now, did anyone tell Richards this woman is talking to the SEC? No. The evidence on that point is that he was named in the DFEH complaint about, I believe, harassment and discrimination, and that he was named in that charge and received it. But I don't believe there's evidence in the record about Richards knowing at that time that she was talking to the SEC. And at one point while I'm there, Your Honor, to go to your question about the subpoena, I think we need to clarify the record there, that the supplemental excerpt of the record, pages 5 through 9 and 14 through 16, that is the only evidence in the record about this supposed subpoena, which is Heineman's testimony saying that she was, in fact, subpoenaed for that April 2003 meeting. She doesn't say she was subpoenaed to turn over the computer or do anything other than testify. And as Your Honor pointed out correctly, she doesn't turn the computer over until five months later, and she testified in that same portion of the supplemental excerpt that I cited to, that she didn't hear anything from them until November. So five months later when she was invited to talk more in New York, and at that time she turned over the computer, she doesn't say anything about the subpoena requiring the production of that computer. And so I wanted to clarify that point because the subpoena isn't in the record. It's only her testimony about it, and that limited testimony only establishes that she was called in in April and was not requested to turn the computer over at that time. Returning to the other evidence that they rely on, and I won't go through, I've talked a little bit about Andy Richards as well as Brian Urquhart. Dorothy Pace, they say, must have been involved in this investigation. But the testimony they cite is at ER 1947 through 52. It doesn't say anything about that. It simply says that she, as the local HR manager, was informed of the results of the investigation and talked to Richards about how to effect termination. It's mixed up because there are multiple investigations here. There's the investigation of her phony order. There's the investigation of her harassment and sex discrimination, and there's the SEC investigation. True. The only investigation I was talking about is with respect to the phony order. Now, Richards knew of the complaint about his discrimination, right? Yes. And my point there, that's going back to the reasonable inference. What they want you to do is say if you have the fact that someone knows about protected activity and knows that this investigation by Grace Caden is going on, that you therefore, that it's reasonable, therefore, to infer that Richards, the person with the knowledge, had to have been involved in the investigation, with no evidence saying from anyone that he actually was involved in the investigation. Wait a minute. I don't know if that's the inference that's really at issue. I think the inference at issue is that Richards would want to fire her to retaliate for his naming him in her harassment and discrimination complaint, and Grace Caden's report was a mere pretext for it. But I think to get there, I think where you have to get to the inference I'm talking about is to say that it's protectual, that Caden's investigation is protectual, and there's no evidence because. . . No, it could have been a genuine investigation, but the man who made the decision was biased. Well, and then I think what you have to look at is their burden to come forward. So if you assume I'm correct on that point, that the investigation, that there's no evidence that that was protectual, so what you have is an independent investigation that comes out with result X, Terminator, and then Richards, who has knowledge of the complaint, which I conceded, right, their burden is to come forward with specific substantial evidence to say that him following that recommendation, which seems imminently reasonable based on the record developed by Caden, I would argue that for him not to follow that recommendation, when you've got an internal audit department telling you, I've investigated. . . Well, it's a very flimsy investigation. I mean, it's the sort of thing, you can argue it. You make a plausible case, but he can make a plausible case to a jury, too. And it's one of those things, I'll tell you, from my point of view, it's not a matter of law. It's not a matter of summary judgment. It's something that's quintessentially a jury issue. Well, and where I disagree, Your Honor, is, and this is why when I came back, I didn't want to make too much out of saying the matter of law issue. What I was saying there is the question is not do you have to prove that she actually forged it. It's at the time the company made the decision, did they have a reasonable basis to infer that? And here, clearly, they have a written letter. . . A biased person did, but a biased person, then you're in a different ballpark. Well, and what I'm saying here is I don't think you're at the bias because when you're. . . And to be completely candid with you, of course, you're defending a company that's been believed, was proved to have engaged in massive fraud. And so, in many reasons, they kill a whistleblower as quickly as they could. So all that is in the background. Well, that's in the back. . . They're not living in a, they're not totally immune to what's going on in the world. True, but you're talking about an organization with tens of thousands of employees. None of the individuals here were involved in that, in the SEC investigation that resulted in. . . Well, Mr. Katz probably knew a good deal about it. No, Mr. Katz is the in-house counsel. He responded to her allegation that something. . . He was very anxious to find out. There's no evidence in the record of that. Even if there were, you could be working for Enron, and it can be all over the newspapers about all the criminality alleged, and you still can't forge orders to get commissions, and you can't steal your computer on your way out the door. Well, that's perfectly true, Judge Klein. Well, the point is it's very implausible that this woman, to make a couple of hundred dollars. . . Maybe that's the one they caught her on. There's that. . . How many times did they catch people on this sort of thing? That would have been a relevant fact about it. You didn't bring that up. Let's stop the time for counsel. We'll give you a little. . . I think the question was how many times have they. . . They brought forth no evidence to suggest that this ever came up before and was treated differently. That is in the record, and I don't know the answer to that. But it's not as simple as she was going to make a couple hundred bucks. There are, and I believe this is in her deposition testimony that's part of the record. For salespeople, they get these quotas, and if they hit a certain number, then all of a sudden the percentage of their commission on subsequent sales goes way up. So it's not simply as easy as, oh, I'm going to make a hundred bucks here. It's I could actually get my commission percentage stepped up simply by hitting a certain target. I see I have two minutes left. There is a cross-appeal. Should I address that now or do you want to close? Okay. I think on the cross-appeal, I don't see much dispute on the elements of our causes of action, save for one, and that is the description of trade secrets. While my time is running short, I would submit there that the Palmer Declaration, I believe, is in keeping with establishing a description of trade secret information consistent with the statutes, and that is at the supplemental excerpt at 218. The primary defense that they've offered to the claims is that her conduct was privileged under Civil Code 47. Our position is Civil Code 47 protects a communication. She's not being sued for communicating with the government about these accounting issues. What she was being sued for is not turning over the computer to which Computer Associates had a right, and she did not surrender it to the government until five months later, and it's not clear at all that that was pursuant to subpoena. She finally turned it over at her deposition almost a year later. So I don't see Sections 47 as providing immunization to keep someone else's property. Had she been subpoenaed and had to turn it over, I agree that the government could have executed a warrant, there could have been a copy made, but none of that's in the record. She just simply kept it. And the case that they rely on, CSER, I submit is an apposite because in CSER, what was going on is it was an interesting situation. CSER was trying to buy sophisticated technology from Fairchild. Fairchild was suspicious about CSER in terms of violations of export control laws, made U.S. Customs aware, and Customs set up a sting where Fairchild essentially entrapped CSER. CSER was then punished, and CSER turned around and sued the civil court as the plaintiff against Fairchild saying, you know, you've defrauded us into getting in trouble. So the damages in that that they were seeking there were flowing from that conduct. Here we're not saying damages that we're seeking to recover are flowing from her talking to the government. It's simply from her retaining our property that's confidential information that has significant economic value to competitors. And I think on the other point I'll address briefly is the unclean hands defense. I think the Pond case and the Unilogic case cited in our brief make the point that fairly clearly, unclean hands doesn't apply just because out there in the world there's a problem with one of the parties. It has to flow from conduct directed by the party to the other party in the litigation. In other words, in this case for unclean hands to apply, they have to show that Computer Associates somehow was targeting Heinemann through these issues of accounting fraud. And that simply is absurd. Otherwise it would be any corporation that has a problem could be viewed subject to an unclean hands defense in a case like this. If there are other questions, obviously happy to answer them. Thank you. Is Judge Noonan indicated because of these inferences, which all must be drawn in favor of Planoff, and because this is a case that deals primarily with motive and intent, why did they fire Heinemann? What was the driving factor behind the termination? That's why we have juries. And I think that they've got their argument, we've got our argument. The inferences drawn in favor of Heinemann I think require reversal of this ruling. I think Heinemann is entitled to her day in trial. That's all, unless you all have any questions. Thank you, counsel. Heinemann versus Computer Associates is submitted. We are adjourned for the day. All rise. This court for this session stands adjourned. Thank you. Thank you. Thank you.
judges: Canby, Noonan, Kleinfeld